[Cite as *State v. Coffman*, 2022-Ohio-2431.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                                    Court of Appeals No.  OT-21-011

        Appellee                                            Trial Court No.  CRB 1900493

v.

Todd M. Coffman                                          **DECISION AND JUDGMENT**

        Appellant                                            Decided:  July 15, 2022

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Alec W. Vogelpohl, Assistant Prosecuting Attorney, for appellee.

Edwin M. Bibler, for appellant.

* * * * *

**ZMUDA, J.**

## I.    Introduction

{¶ 1} Appellant, Todd Coffman, appeals the judgment of the Ottawa County

Municipal Court, sentencing him to 180 days in jail, 150 days of which were suspended,

after a jury found him guilty of misdemeanor assault.  Finding no error in the proceedings

below, we affirm.

## A.  Facts and Procedural Background

{¶ 2} On June 10, 2019, a complaint was filed with the trial court, charging appellant with one count of assault in violation of R.C. 2903.13, a misdemeanor of the first degree.  The assault charge stemmed from an incident that occurred two days earlier, in which appellant was involved in an altercation with Kevin Gladden, whom he allegedly pushed to the ground.  On June 11, 2019, appellant appeared before the trial court for arraignment and entered a plea of not guilty.

{¶ 3} The matter proceeded through pretrial discovery and motion practice, culminating in a jury trial on February 4, 2021.  For its part, the state called three witnesses at trial.  Appellant testified on his own behalf and called two additional witnesses during his case-in-chief.

{¶ 4} For its first witness, the state called Gladden.  According to Gladden, he was fishing with his grandson, Brendon Krause, at the end of the Knecht's Beach and Marina pier located in Salem Township on June 8, 2019.  It was a windy day with little boat traffic coming into or out of the marina.  At mid-morning, a pair of jet-skis operated by appellant's sons entered the marina, passing through the area where Gladden was fishing and out to the lake.  Gladden and Krause noticed the jet-skiers, which prompted Gladden to tell Kraus that the two would need to pull in their fishing lines when the jet-skiers returned to avoid getting them caught up in the jet-skis.

{¶ 5} Later in the day, the jet-skiers returned to the marina.  Upon noticing this, Gladden attempted to reel in his fishing line, but he was unable to do so in time to avoid

2.

the jet-skis.  Gladden testified that the jet-skiers "were already in, you know, into the marina by the time I got to my reel."

{¶ 6} As the jet-skiers passed by the location of his line, Gladden noticed his fishing pole start to bend over into the marina, indicating that the line was caught on the jet-skis.  Gladden then yelled for the jet-skiers to stop so that he could free his line.  By the time the jet-skiers responded, all of the fishing line was pulled out of the reel.  Consequently, Gladden began to walk back to his trailer to retrieve a replacement fishing pole.

{¶ 7} On his way to the trailer, Gladden was confronted by appellant.  Gladden testified that appellant approached him in a yellow golf cart, stopped two feet from him, exited the cart, and "came face-to-face" with him.  Appellant was accompanied on the golf cart by his wife, Charity.  Appellant then began to scream at Gladden "at the top of his lungs with * * * a red face and he [said]: 'I told you I'll handle it.'"

{¶ 8} In response to appellant's aggressive posture, Gladden tried to explain to appellant that he was merely trying to get his fishing line back when he yelled out to appellant's sons to stop.  During the confrontation, Gladden lifted his rod to show it to appellant, and stated "all [the jet-skiers] had to do is wait till I reeled it in."  Appellant responded by telling Gladden not to invade his personal space.  Appellant "took a step forward and he blasted [Gladden] with both hands in the chest."  Appellant used such force in shoving Gladden that his feet lifted off the ground and he fell onto his back.  As he fell, Gladden's back and elbows scraped the stone surface below.  According to

3.

Gladden, he hit his head when he fell, but the only visible markers of injury were on his back and elbows.

{¶ 9} After Gladden fell to the ground, appellant stood over him with clenched fists. Gladden threatened to call the sheriff, and appellant responded by stating: "Go ahead. I'm a deputy sheriff myself." The confrontation ended shortly thereafter, and Gladden called the police to report the matter. Sergeant Brandon Amory of the Ottawa County Sheriff's Office responded to the scene and investigated the matter. While there, Amory took photographs of Gladden, which depict scrape marks on Gladden's elbows, redness on his chest, and skid marks on the back of his shirt. These photographs were admitted into evidence at trial.

{¶ 10} Following Gladden's testimony, the state called Kraus as its second witness. In general, Klaus reiterated Gladden's version of the events that transpired on June 8, 2019. Specifically, Klaus confirmed that appellant's sons departed the marina on their jet-skis, returned shortly thereafter, and abruptly entered the marina, snagging Gladden's fishing line and pulling the fishing pole out of Gladden's hands in the process. According to Klaus, Gladden yelled at the jet-skiers to get their attention. Klaus recalled that "expletives were shared," but he could not remember precisely what was said.

{¶ 11} In a departure from Gladden's testimony, Klaus stated that, when Gladden left the area where he was fishing, he headed toward appellant's sons to "meet [them] to tell [them] to slow down." On redirect examination, Klaus acknowledged that Gladden's trailer was in the same direction as appellant's sons. Further, Klaus admitted that he was

4.

assuming that Gladden was going to talk to the sons, and Gladden never expressly told him that he was going to do so.

{¶ 12} After Gladden departed the fishing area, Klaus began to pack up his fishing equipment. He did not witness the altercation between Gladden and appellant that ultimately occurred.

{¶ 13} For its third and final witness, the state called sergeant Amory. On June 8, 2019, Amory was dispatched to the scene of the altercation involving appellant and Gladden. Upon arrival, Amory spoke with several individuals including, among others, Gladden, appellant, and Charity, and appellant's children. Bodycam footage of these conversations was entered into evidence and played for the jury at trial.

{¶ 14} During Amory's conversation with Gladden, Gladden recounted the events that led up to the confrontation with appellant and appellant's shoving him to the ground. Gladden proceeded to show Amory the injuries he sustained from the incident, including those to his elbows, back, and chest. Amory confirmed that he took the photographs of these injuries that were previously admitted into evidence. As he explained the injuries depicted in the photographs, Amory noted that the stain on the back of Gladden's shirt "is running basically up and down or vertical on his shirt." Amory testified that, in his experience, such markings were consistent with "somebody being pushed down."

{¶ 15} After speaking with Gladden, Amory ascertained appellant's whereabouts and proceeded to question appellant, who admitted to confronting Gladden upon hearing Gladden yelling at his children. Contrary to Gladden's recitation of the facts, appellant

5.

told Amory that he did not shove Gladden, but that "he put his hands up and Mr. Gladden ran into his hands."

{¶ 16} Moments later, Amory spoke with Charity and appellant's children about the events that transpired prior to the physical altercation between appellant and Gladden. According to Charity, the altercation took place only after Gladden entered appellant's "personal space."

{¶ 17} In light of his observation of the injuries Gladden sustained from the altercation with appellant, namely the "marks on his arms, the mark on his back," Amory decided to arrest appellant and charge him with assault.

{¶ 18} At the conclusion of Amory's testimony, the state rested. Appellant then made a motion for acquittal under Crim.R. 29, arguing that the state's evidence demonstrated that Gladden, not appellant, was the aggressor. The trial court summarily denied appellant's Crim.R. 29 motion, and the matter proceeded to appellant's case-in-chief.

{¶ 19} As his first witness, appellant called his son, Jaden Coffman, to the stand. Jaden testified that he and his younger brother, Gunner, took two jet-skis out to the lake through the channel at Knecht's Beach five minutes prior to the incident at issue here. Upon return, Jaden and Gunner took their jet-skis through the channel, entering at a speed of "25 to 30 miles an hour." Jaden noticed that his person and his jet-ski became entangled in fishing line as he passed through the channel. According to Jaden, Gladden became angry that Jaden caught his fishing line and "started yelling immediately as soon

6.

as [he] caught [Gladden's] line." In particular, Jaden testified that Gladden called him a "dumbass, a mother fucker, and stupid." Meanwhile, Jaden was yelling back at Gladden and calling Gladden a "stupid old fuck."

{¶ 20} Thereafter, Jaden proceeded through the channel and into the docking area where he was planning to pull the jet-skis from the water. Jaden acknowledged that he did not witness the altercation between appellant and Gladden that eventually occurred.

{¶ 21} Following Jaden's testimony, appellant called Charity to the stand. Charity testified that she witnessed the altercation between appellant and Gladden. Prior to the altercation, as Jaden and Gunner were parking their jet-skis, Charity drove her golf cart down to the docking area. When she arrived, appellant instructed her to "scoot over, we need to go deal with something." Charity slid over to the passenger seat and appellant drove the golf cart to Gladden's location.

{¶ 22} Contrary to Gladden's testimony, Charity stated that appellant stopped his golf cart 16 feet from Gladden, and thus did not impede Gladden's ability to continue walking. Charity continued: "We stopped, [Gladden] continued moving in our direction. * * * When he was moving in our direction, it was a very fast-paced, arm movement motion like this with a fishing pole in his hand." According to Charity, Gladden began talking to appellant about his fishing pole as he is walking in appellant's direction. Appellant then instructed Gladden to "Stop, don't walk up on me." At this point, Charity saw Gladden briskly walk into appellant, who had his hands up at the time. During the

7.

collision, Gladden fell to the ground. Charity insisted that appellant did not extend his arms to shove Gladden.

{¶ 23} After Charity finished testifying, appellant took the stand as the final witness at trial. Regarding the incident that occurred on June 8, 2019, appellant testified that he was standing at the boat ramp awaiting the return of his sons on their jet-skis when he heard "yelling and screaming and cussing" coming from the entranceway into the marina. Appellant looked in the direction of the disturbance and noticed Jaden standing on his jet-ski, arms flailing in the air. Eventually, Jaden freed himself and continued into the marina toward the boat ramp. Meanwhile, appellant heard Gladden call out to Jaden: "You little mother fucker. You come back here and I'll show you."

{¶ 24} In response to the foregoing, appellant decided to confront Gladden as Gladden was walking in the direction of the boat ramp. Consequently, appellant told Charity to slide to the passenger seat of their golf cart, and proceeded to drive the golf cart up to Gladden.

{¶ 25} According to appellant, he stopped the golf cart "10 to 15 feet" from Gladden, who continued walking toward him "flailing a fishing pole like a samurai sword." Appellant attempted to speak with Gladden, but Gladden refused. Appellant testified that Gladden then walked around the back of the golf cart in appellant's direction. Appellant put up his hands to stop Gladden's advance and Gladden hit appellant's hands and fell to the ground. Appellant testified that he did not shove Gladden, and he surmised that Gladden would have collided with him had he not stopped

8.

Gladden. According to appellant, he was concerned that Gladden might head-butt him, knee him, kick him, or hit him with the fishing pole. Appellant described Gladden's demeanor as he approached him as "highly irate, pissed off, and * * * as he [came] to the rear of the golf cart, it was like two forceful steps straight at me."

{¶ 26} At the conclusion of his testimony, appellant rested. Thereafter, the matter proceeded to a discussion about jury instructions outside the presence of the jury. During the discussion, the issue of self-defense was raised. The state argued that an instruction on self-defense and defense of others was not merited in light of appellant's testimony that he approached Gladden and thus created the situation that culminated in Gladden falling to the ground. In response, appellant's defense counsel conceded that an instruction for defense of others was not merited, but insisted that a self-defense instruction was appropriate because appellant put his hands up to defend himself from Gladden's advance. According to defense counsel, the fact that appellant drove up to Gladden was irrelevant as the confrontation began when Jaden became entangled in Gladden's fishing line, prior to appellant's arrival.

{¶ 27} Upon consideration of the parties' arguments, the trial court agreed with appellant that an instruction on self-defense was appropriate in light of the evidence presented at trial. However, the trial court determined that an instruction for defense of others was not supported by the evidence in light of the distance between Gladden and appellant's sons at the time of the altercation, and thus refused to instruct the jury on that

9.

issue. At that point, the jury was called back into the courtroom and instructed as to the law. Specifically, the trial court instructed the jury on self-defense as follows:

> Now, testimony has been admitted in this case from which you may find that the Defendant acted in self-defense. The Defendant is allowed to use non-deadly force in self-defense. The State must prove beyond a reasonable doubt that the Defendant did not use deadly force in self-defense. To prove that the Defendant did not use non-deadly force in self-defense, the State must prove beyond a reasonable doubt at least one of the following. That the Defendant was at fault in creating the situation giving rise to the event, or the Defendant did not have reasonable grounds to believe that he was in imminent or immediate danger of bodily harm, or 3; that the Defendant did not have an honest belief, even if mistaken, that he was in imminent or immediate danger of bodily harm.

{¶ 28} The trial court then detailed the individual elements of self-defense, describing the terms "non-deadly force," "reasonable grounds," "honest belief," and "substantial risk." Ultimately, the court instructed the jury: "If you find that the State proved beyond a reasonable doubt all of the essential elements of the crime of assault, and that the State proved beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant guilty according to your findings."

{¶ 29} Following jury instructions, the parties provided their closing statements and the jury retired for deliberations. Ultimately, the jury found appellant guilty of the

10.

sole charge of assault. The trial court then ordered the preparation of a presentence investigation report and continued the matter for sentencing.

{¶ 30} At sentencing, the trial court ordered appellant to serve 180 days in jail, 150 days of which were suspended, imposed a fine of $250 plus court costs, and placed appellant on probation for a period of two years. Appellant's timely notice of appeal followed.

### B.        Assignments of Error

{¶ 31} On appeal, appellant assigns the following errors for our review:

Assignment of Error No. 1: The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charge, and thereafter entering a judgment of conviction of that offense as the charge was not supported by sufficient evidence.

Assignment of Error No. 2: The jury verdict was against the manifest weight of the evidence presented at trial.

Assignment of Error No. 3: The trial court erred by not submitting self-defense on the verdict form to the jury and by not providing more instruction on self-defense.

Assignment of Error No. 4: Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

11.

Assignment of Error No. 5: The sentence ordered by the trial court was contrary to the principles and purposes of misdemeanor sentencing pursuant to R.C. 2929.21 and 2929.22 and not supported by the record.

## II.    Analysis

### A.    Sufficiency of the Evidence

{¶ 32} In his first assignment of error, appellant argues that his conviction for assault was not supported by sufficient evidence.

{¶ 33} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The inferences reasonably drawn from the state's evidence, like the evidence itself, are to be viewed in a light most favorable to the state. *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999).

{¶ 34} Here, appellant was convicted of assault in violation of R.C. 2903.13(A), which provides: "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn."

{¶ 35} Under R.C. 2901.01(A)(3), "physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." *See also State v. Sepeda*, 6th Dist. Lucas No. L-21-1123, 2022-Ohio-1889, ¶ 39 fn. 2 ("Simple assault under R.C. 2903.13(A) also merely requires proof of physical harm, rather than serious

12.

physical harm.").  "A victim's testimony is all that is needed to 'sustain a conviction for assault in violation of R.C. 2903.13(A) if the victim's testimony proves all the elements of the offense.'" *State v. Lewis*, 2020-Ohio-3762, 156 N.E.3d 281, ¶ 20 (12th Dist.), quoting *State v. Lunsford*, 12th Dist. Butler No. CA2019-07-116, 2020-Ohio-965, ¶ 13.

{¶ 36} In the present case, Gladden testified that he was confronted by appellant while he was headed toward his trailer following the fishing line incident involving appellant's sons.  According to Gladden, appellant had an aggressive posture and began screaming.  After Gladden tried to show his fishing rod to appellant, appellant took a step toward Gladden and pushed him in the chest with both hands, causing Gladden to fall to the ground with such force that his back and elbows were scraped by the gravel surface, as confirmed by photographs taken by sergeant Amory and introduced into evidence by the state at trial.  Further, Gladden testified that he hit his head when he fell to the ground after appellant shoved him.

{¶ 37} Viewing the foregoing testimony from Gladden in a light most favorable to the prosecution, we find that the state introduced sufficient evidence to establish that appellant knowingly caused physical harm to Gladden, and thus the jury could have found the essential elements of assault under R.C. 2903.13(A) proven beyond a reasonable doubt.

{¶ 38} Appellant, in his brief, does not dispute this conclusion.  However, appellant insists that the state's evidence was insufficient to establish that he did not act

13.

in self-defense given the fact that he "maintained that he acted in self-defense in raising his arms up as [Gladden] came towards him."

{¶ 39} Under R.C. 2901.05(B)(1),

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 40} In order to use non-deadly force in self-defense, a defendant (1) must not be at fault in creating the situation that gave rise to the altercation and (2) must also have "reasonable grounds to believe and an honest belief, even though mistaken, that he is in imminent danger of bodily harm and his only means to protect himself from such danger is by the use of force not likely to cause death or great bodily harm." *State v. Smith*, 6th Dist. Wood No. WD-19-070, 2020-Ohio-5119, ¶ 34, citing *State v. Owens*, 6th Dist. Lucas No. L-18-1056, 2019-Ohio-311, ¶ 9.

{¶ 41} As with the elements of assault, the testimony provided by Gladden in this case was sufficient to meet the state's burden on the issue of self-defense. According to Gladden, appellant initiated the altercation that resulted in appellant shoving Gladden to

14.

the ground. Further, Gladden insisted that appellant shoved him without any prior provocation or threats from Gladden. We find that this evidence, when viewed in a light most favorable to the prosecution, establishes that any rational trier of fact could have found the elements of assault and that appellant did not use force in self-defense. Therefore, the state met its burden under R.C. 2903.13(A) and 2901.05(B)(1).

{¶ 42} Accordingly, appellant's first assignment of error is not well-taken.

### B.        Manifest Weight of the Evidence

{¶ 43} In his second assignment of error, appellant contends that his assault conviction was against the manifest weight of the evidence.

{¶ 44} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 45} Under this assignment of error, appellant reiterates the same arguments he raised in his first assignment of error with respect to self-defense, and complains that "[t]he jury must have completely discounted the testimony that the Appellant was not the

15.

initial aggressor and only responded with non-deadly force because he genuinely believed his life was put in danger by the victim."

**{¶ 46}** In essence, appellant's argument boils down to an acknowledgement that this case involves two competing versions of the altercation that transpired at Knecht's Beach on June 8, 2019. According to Gladden, appellant aggressively, and without provocation, shoved him to the ground because appellant was angry about Gladden's interaction with appellant's sons. By contrast, appellant and Charity testified that Gladden was not shoved to the ground. Rather, Gladden fell to the ground after colliding with appellant while appellant's hands were in the air. Appellant insisted that he lifted his arms only to defend himself against Gladden, who was "highly irate," armed with a fishing pole, and briskly advancing in appellant's direction.

**{¶ 47}** In light of the foregoing competing evidence, the jury's verdict is the product of its determination as to the credibility of the witnesses. While we are permitted to assess the credibility of the witnesses in a manifest weight review, we do so only to determine whether the jury clearly lost its way. It remains true that, even in a manifest weight review, the jury is in a better position to evaluate witness credibility than we are, particularly because we have only a cold record from which to draw inferences regarding credibility. *See Tabak v. Goodman*, 7th Dist. Mahoning No. 21 MA 0042, 2022-Ohio-1123, ¶ 20 ("Because the testimony presents a he-said-she-said situation, the trial court was in the best position to judge credibility and determine whether to believe Appellant or Appellee.").

16.

{¶ 48} Given the record before us, we cannot say that the jury clearly lost its way or created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This is especially true in light of the extent of Gladden's injuries, which included scrapes to his elbows and skid marks on the back of his shirt. Although such marks could perhaps stem from Gladden merely colliding with appellant and falling to the ground, as appellant testified, they are more consistent with Gladden's testimony that appellant violently shoved him to the ground.

{¶ 49} Accordingly, appellant's second assignment of error is not well-taken.

### C.    Self-Defense Instruction

{¶ 50} In his third assignment of error, appellant argues that the trial court erred in failing to provide a written copy of its self-defense instructions to the jury and failing to include a provision on the jury verdict form for the jury to expressly indicate its findings as to self-defense.

{¶ 51} At the outset, we note that appellant did not object to the trial court's handling of jury instructions or the phrasing on the verdict form that was provided to the jury. Therefore, appellant has forfeited all but plain error. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 350. Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error, appellant must show that "an error occurred, that the error was plain, and that but for the error the outcome of the trial clearly would have been otherwise." *Id.* at ¶ 124, citing *State v. Mammone*, 139 Ohio

17.

St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69.  We recognize plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 52} With the appropriate standard of review in mind, we turn to the substance of appellant's argument.  When instructing the jury, the trial court should include "all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.  "Further, the defendant is entitled to 'complete and accurate jury instructions on all the issues raised by the evidence.'" *State v. White*, 2013-Ohio-51, 988 N.E.2d 595, ¶ 97 (6th Dist.), quoting *State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992).

{¶ 53} Here, the trial court verbally addressed the jury and instructed them on the law of self-defense at length.  As noted above in our recitation of the facts, the trial court explained that appellant was allowed to use non-deadly force in self-defense and that the state had the burden to prove beyond a reasonable doubt that appellant did not use such force in self-defense.  The court went on to accurately, and precisely, articulate what the state had to demonstrate in order to meet its burden on self-defense.  The court then provided the jury with definitions of key terms such as "non-deadly force," "reasonable grounds," "honest belief," and "substantial risk."  Finally, the court instructed the jury: "If you find that the State proved beyond a reasonable doubt all of the essential elements

18.

of the crime of assault, and that the State proved beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant guilty according to your findings." Thereafter, the jury was provided with an audio recording of the instructions. During their deliberations, the jury requested the instructions in writing, but the trial court denied the request and referred the jury to the audio recording.

{¶ 54} On appeal, appellant does not argue that the trial court's self-defense instructions were anything but accurate and complete. Instead, he argues that the instructions should have been provided in writing rather than in the form of an audio recording, because the law of self-defense in Ohio is "complex."

{¶ 55} Notably, appellant cites no authority for the proposition that a trial court must provide the jury with a written copy of its instructions, and our research has found no such authority. On the contrary, Crim.R. 30(A) expressly authorizes the trial court to provide the jury with an audio recording of its instructions in place of written instructions.

{¶ 56} Concerning the provision of jury instructions to the jury, Crim.R. 30(A) provides, in relevant part: "The court shall reduce its final instructions to writing *or make an audio, electronic, or other recording of those instructions*, provide at least one written copy *or recording* of those instructions to the jury for use during deliberations, and preserve those instructions for the record." (Emphasis added.) Thus, we find no error,

19.

plain or otherwise, in the manner in which the trial court provided its instructions to the jury below.[1]

{¶ 57} Next, we turn to appellant's contention that the trial court erred in failing to include a line item on the verdict form for the jury to expressly indicate its finding as to self-defense. This same argument was raised, and rejected, by the Eighth District in *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367.

{¶ 58} In *Jones*, the defendant argued that "the trial court erred in failing to give the jury a separate verdict form regarding his affirmative defense of self-defense." *Id.* at ¶ 88. The court in *Jones* began its analysis by noting that the trial court provided specific and detailed instructions on self-defense to the jury. Based on its presumption that the jury followed these instructions and the fact that the defendant's defense counsel "repeatedly argued both in opening and closing arguments that [the defendant] had acted in self-defense," the court found that a separate verdict form on the issue of self-defense was unnecessary. *Id.* at ¶ 93. The court explained that "[e]ven without a separate verdict form on the issue of self-defense, the jury was well aware that it was free to consider [the defendant's] claim of self-defense and to find him not guilty of the offenses to which the defense applied on that basis, if they believed him." *Id.*

---

[1] Appellant makes no mention of Crim.R. 30(A) in his merit brief. However, he acknowledges in his reply brief that, under Crim.R. 30(A), "the trial court is allowed to provide a recording of jury instructions."

20.

**{¶ 59}** Relying upon several cases from other districts that rejected the notion that a trial court is required to provide a provision for affirmative defenses on a jury verdict form, the court rejected the defendant's argument. *Id*. at ¶ 94, citing *State v. McClain*, 5th Dist. Guernsey No. 10-CA-10, 2011-Ohio-1623, ¶ 40 ("We * * * find no law in the state of Ohio requiring the jury verdict forms to provide a place for a jury to reject an affirmative defense."), *State v. Hobbs*, 5th Dist. Richland No. 2007-CA-0115, 2008-Ohio-4658, ¶ 18 (finding no error in the trial court's omission of affirmative defense of inability to pay on verdict form, noting that "we have found nothing which requires or suggests that an affirmative defense be set forth on the verdict form."), *State v. Reeds*, 11th Dist. Lake No. 2007-L-120, 2008-Ohio-1781, ¶ 53 and 62 (while conceding that "it may be argued that inclusion of a separate finding relating to self-defense would ensure clarity," finding no error where the verdict form did not contain a separate finding for self-defense), and *State v. Black*, 5th Dist. Stark No. 2011 CA 00175, 2012-Ohio-2874, ¶ 42 (no plain error where the trial court did not provide the jury with a separate verdict form for the defense of self-defense).

**{¶ 60}** Like the jury in *Jones*, the jury in this case was thoroughly instructed on the issue of self-defense, as explained above. "A jury is presumed to follow the instructions * * * given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Moreover, appellant's defense counsel argued that appellant acted in self-defense during closing arguments and urged the jury to find appellant not guilty on that basis. Specifically, counsel argued that appellant "should be totally exonerated and found not guilty of the

21.

crime. Mr. Coffman has no duty to retreat. And those will be in your instructions. He didn't cause the situation. Every citizen in the State of Ohio has a right to put their hand up and not – and stop a transgression onto them." On this record, we find no error in the trial court's use of a verdict form without a specific provision addressing the issue of self-defense.

{¶ 61} Accordingly, appellant's third assignment of error is not well-taken.

### D.    Ineffective Assistance of Counsel

{¶ 62} In his fourth assignment of error, appellant argues that his trial counsel provided him with ineffective assistance at trial.

{¶ 63} To demonstrate ineffective assistance of counsel, appellant must first show that trial counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because "effective assistance" may involve different approaches or strategies, our scrutiny of trial counsel's performance "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Should appellant demonstrate her trial counsel's performance was defective, appellant must also demonstrate that prejudice resulted. *Bradley* at paragraph two of the syllabus.

{¶ 64} Here, appellant contends that his trial counsel was ineffective for failing to object to the trial court's refusal to provide the jury with written instructions and a

22.

"proper verdict form." According to appellant, the failure of his counsel led to confusion for the jury, as demonstrated by the jury's request for written instructions.

{¶ 65} Notably, appellant does not demonstrate, or even assert, how the outcome of the proceedings would have been different had his trial counsel objected to the trial court's denial of the jury's request for written instructions and the trial court's verdict form. As already noted, the issue of self-defense was clearly before the jury, and was even emphasized by trial counsel in closing arguments. The jury was thoroughly instructed on the issue, and had an audio recording of the instructions to consider during deliberations. Consequently, we cannot say that there is a reasonable probability that, but for trial counsel's failure to object to the trial court's denial of the jury's request for written instructions or to the verdict form used by the trial court, the result of the trial would have been different. *See Jones*, *supra*, at ¶ 95-105 (rejecting a similar ineffective assistance argument premised upon trial counsel's failure to request a separate verdict form on self-defense).

{¶ 66} Accordingly, appellant's fourth assignment of error is not well-taken.

### E.    Sentencing Issues

{¶ 67} In his fifth and final assignment of error, appellant argues that his sentence is contrary to the principles and purposes of misdemeanor sentencing and is not supported by the record.

{¶ 68} We review a misdemeanor sentence for an abuse of discretion. *State v. Johnson*, 6th Dist. Lucas Nos. L-20-1164, L-20-1165, 2021-Ohio-1614, ¶ 22, citing *State*

23.

*v. Perz*, 173 Ohio App.3d 99, 2007-Ohio-3962, 877 N.E.2d 702, ¶ 26 (6th Dist.). "When imposing a sentence for a misdemeanor offense, a trial court must consider the purposes and principles of misdemeanor sentencing as set forth in R.C. 2929.21, as well as the sentencing factors set forth in R.C. 2929.22." *State v. Potter*, 6th Dist. Fulton No. F-21-002, 2021-Ohio-3502, ¶ 25. The overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and to punish the offender. R.C. 2929.21(A). To achieve those purposes, a trial court "shall consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." *Id.* We presume that a sentencing judge who imposes a misdemeanor sentence that is within the appropriate statutory range has followed R.C. 2929.21, absent evidence to the contrary. *State/Division of Wildlife v. Coll*, 6th Dist. Sandusky No. S-16-022, 2017-Ohio-7270, ¶ 23, citing *Toledo v. Reasonover*, 5 Ohio St.2d 22, 213 N.E.2d 179 (1965), paragraph one of the syllabus.

{¶ 69} In this case, appellant was convicted of assault in violation of R.C. 2903.13, a misdemeanor of the first degree that is punishable by up to 180 days in jail. R.C. 2929.24(A)(1). Thus, the trial court's sentence of 180 days in jail, 150 days suspended, is within the statutory range, and we presume that the sentence was proper. *Potter* at ¶ 26, citing *State v. Jones*, 6th Dist. Lucas No. L-16-1014, 2017-Ohio-413, ¶ 14.

{¶ 70} For his part, appellant does not present evidence to rebut this presumption, and offers little more than the conclusory statement that his sentence is "harsh in nature"

24.

considering the fact that he is a first-time offender and this case "equated to a shoving match between two individuals." Moreover, while not providing a specific citation to R.C. 2929.21, the trial court recognized its obligation to consider the principles and purposes of misdemeanor sentencing at the sentencing hearing, stating: "The Court is required [by] the misdemeanor statute, obviously to consider a number of factors and issues. And the Court takes all of this into consideration."

{¶ 71} Based upon the record before us, we conclude that the trial court did not abuse its discretion in sentencing appellant to 180-days in jail, with 150 days suspended. Accordingly, appellant's fifth assignment of error is not well-taken.

### III.    Conclusion

{¶ 72} In light of the foregoing, the judgment of the Ottawa County Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

25.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                                        _____

                                                           JUDGE

Christine E. Mayle, J.

                                       _____

Gene A. Zmuda, J.                                                            JUDGE
CONCUR.

                                       _____

                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.